IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL ACTION NO. |
| v. | 1:17-CR-0229-AT-CMS |
| JOHN BRANDON SCHOPP, | |
| Defendant. | |

## NON-FINAL REPORT AND RECOMMENDATION

## AND ORDER

This matter is before the Court on the Motion to Dismiss the Indictment filed by Defendant John Brandon Schopp ("Defendant") due to prosecutorial misconduct. [Doc. 186].  The misconduct allegedly includes, *inter alia*, compelling Defendant's grand jury testimony under false pretenses and failing to advise Defendant of his Fifth Amendment privilege against self-incrimination prior to eliciting Defendant's grand jury testimony.  [Id.].  For the reasons discussed below, I **RECOMMEND** that Defendant's motion be **DENIED**.

# I.     <u>BACKGROUND</u>

On September 9, 2013, a former Assistant United States Attorney ("the AUSA") issued a grand jury subpoena for documents to "John Brandon Schopp, Registered Agent for Distributech & Affiliated Distribution."   [Doc. 195 at 2 ("September 2013 subpoena")].   The September 2013 subpoena commanded Distributech and Affiliated Distribution ("the Companies") to appear and testify before the grand jury and to bring with them all corporate records and financial documents identified in the subpoena related to the operation of the Companies.  [Id. at 4; Doc. 186 at 2].   The September 2013 subpoena included a business record certification and a waiver of appearance form, which Defendant executed and submitted to the grand jury clerk in the U.S. Attorney's Office with the subpoena return, along with the business records that he was producing on behalf of the Companies.  [Doc. 195 at 13-25].

Three months later, on December 12, 2013, the AUSA issued a federal grand jury subpoena for testimony to Defendant individually.  [Doc. 195 at 8 ("December 2013 subpoena"); Doc. 219 at 2].   On January 25, 2014, the AUSA contacted Defendant's attorney at the time, Steve Murrin, via email ("January 25, 2014 email") and explained that the December 2013 subpoena issued to Defendant individually had been issued in error because the intention had been to issue subpoenas to "each

of the LLCs," meaning the Companies.  [Doc. 195 at 31; Doc. 186 at 3].  The January

25, 2014 email further stated that,

> The [grand jury] testimony scheduled for next week is intended to be a
> follow up to the previous subpoenas.  So I'd be happy to swap the
> existing subpoenas out with subpoenas for testimony addressed to each
> of the LLCs.  I will certainly do that if you tell me that the individuals
> intend to assert their 5th Amendment privilege.  My previous
> experience and understanding from the applicable case law is that the
> LLCs cannot assert a 5th Amendment privilege.  The LLC can
> designate whomever it wishes to appear on its behalf before the grand
> jury, but that person must be prepared to answer the grand jury's
> questions.  So please let me know how you want to handle.

[Doc. 195 at 31].

On February 3, 2014, the AUSA withdrew the December 2013 subpoena

issued to Defendant individually and replaced it with two subpoenas for testimony

addressed to Defendant as registered agent for each of the Companies.  [Doc. 219 at

3; Doc. 195 at 32 (the "February 2014 subpoenas")].[1]

Defendant Schopp appeared and testified before the grand jury on February

26, 2014.  [Doc. 219 at 4].  At the commencement of testimony, the AUSA asked

Defendant if he was present "as a representative of Affiliated Distribution … and

---

[1]  The first subpoena was issued to "John Brandon Schopp, Registered Agent for
Affiliated Distribution," and the second subpoena was issued to "John Brandon
Schopp, Registered Agent for Distributech LLC." [Doc. 195 at 32].  The second
subpoena is not contained within the sealed packet of documents submitted by
defense counsel, but the details of the subpoena are reflected in counsels' filings.

3

Distributech LLC," to which Defendant responded "yes." [Doc. 195 at 39].[2]   The initial questions and testimony concerned Defendant's relationship to the Companies as well as his and the Companies' relationship to Hi-Tech Pharmaceuticals, Inc. ("Hi-Tech").   [Doc. 195 at 39-56].   The AUSA also asked questions about Defendant's earlier production of documents on behalf of the Companies, the process that was undertaken to identify and gather responsive records, the payment of monies by Hi-Tech to Defendant and the Companies as reflected in the 1099s that Defendant had produced, and the fact that many of the categories of documents requested in the subpoena had not been produced.   [Id. at 49-51].   Defendant acknowledged that he had made only a partial production, that he had additional responsive documents that had not been produced on advice of counsel, and that he also had other "stuff" stored in boxes that he did not believe needed to be produced. [Id. at 50].   Defendant was asked what the Companies did for Hi-Tech, and what type of benefits he received from Hi-Tech through the Companies, to which Defendant responded, "I manufacture products for third-party companies using Hi-Tech's facility to do so."   With regard to benefits, Defendant testified that he received a discount on health insurance.  [Id. at 51-52].

---

[2] The transcript of Defendant's grand jury testimony begins on page 37 of Docket Entry 195.  For ease of reference, the page references herein are to the electronic page numbers reflected in the header of the CM/ECF filing rather than the page numbers of the hardcopy transcript of the testimony.

Defendant's answers led to a discussion about his related role as Director of Contract Manufacturing for Hi-Tech and his knowledge of and/or participation in Good Manufacturing Practice ("GMP") audits and issuance of GMP certificates, certificates of free sale, certificates of analysis, and certificates of content. [Id. at 56-72]. The AUSA asked Defendant if he had a role, through the Companies, in Hi-Tech having GMP audits performed, and asked "what is Distributech's or Affiliated Distribution's role in [GMP audits]?" [Id. at 56]. Defendant testified that his role was being physically present during the GMP audit(s). [Id.]. Defendant was also shown emails that had been marked as grand jury exhibits and was asked whether he sent the emails to Hi-Tech employees and/or Hi-Tech customers "through [his] work for Affiliated Distribution or Distributech," to which he responded "yes." [Id. at 57, 61, 64]. The AUSA also asked Defendant if Distributech or Affiliated Distribution had any knowledge about where a particular certificate of free sale attached to one of Defendant's emails came from. [Id. at 68]. In response, Defendant testified that he did not recall, but that any attachment would have been obtained from other Hi-Tech employees. Defendant testified the same in response to questions about other emails attaching allegedly false certificates and audit reports, and disclaimed any knowledge as to whether the attachments were authentic or fake. [Id. at 61-63, 65-67, 69-71].

Three years later, a different grand jury indicted Defendant, charging him with wire fraud and conspiracy to commit wire fraud, based on the alleged transmission of emails to customers attaching fake or false certificates and audit reports. [Doc. 1, Indictment; Doc. 186 at 6-7; Doc. 219 at 4].

## II.   DISCUSSION

In his motion to dismiss, Defendant argues that the indictment should be dismissed for prosecutorial misconduct because: (1) the AUSA abused the grand jury process; and (2) the AUSA failed to give Defendant any warnings as to his Fifth Amendment privilege against self-incrimination before or during his grand jury testimony. [Doc. 186 at 2]. Defendant asks the Court to exercise its supervisory powers to dismiss the indictment to deter future prosecutorial misconduct and preserve the integrity of the grand jury process. [Id. at 9].

### A.   Whether the AUSA Committed Prosecutorial Misconduct by Abusing the Grand Jury Process

Defendant first argues that the AUSA committed misconduct and abused the grand jury process (warranting the dismissal of the indicment): (1) by restructuring the issuance of subpoenas so as to avoid the assertion of the Fifth Amendment privilege by Defendant; (2) by deliberately misguiding Defendant and his attorney with respect to Defendant's right to protect himself against self-incrimination and the scope and purpose of the testimony sought; and (3) by seeking to elicit incriminating testimony on matters wholly unrelated to the subpoenaed documents

6

without providing any Fifth Amendment warnings to Defendant in order to "force from [Defendant's] own lips evidence against him." [Doc. 186 at 10].

Defendant specifically contends that the AUSA abused the grand jury process by "luring [Defendant] before the grand jury under the false pretense that he was appearing as a business records custodian on behalf of Affiliated Distribution and Distributech." [Doc. 186 at 7]. Defendant argues that the AUSA—by stating in his January 2014 email to Defendant's attorney that "[t]he testimony scheduled for next week is intended to be a follow up to the previous subpoenas"—deliberately misled Defendant's attorney into believing that Defendant was being called before the grand jury as a records custodian to answer questions related to the previously subpoenaed corporate records, and it was for that reason that Defendant could not "assert a 5th Amendment privilege." [Doc. 225 at 3]. According to Defendant, the AUSA then intentionally failed to administer a Fifth Amendment warning at the outset of the solicited grand jury testimony so that he could obtain potentially incriminating testimony from Defendant. Defendant argues that once the testimony commenced, he was asked "only a handful" of questions about the documents, "most of which were improper," and was instead queried about documents and matters having nothing to do with the subpoenaed corporate records. [Doc. 186 at 5-6].

In response, the Government argues that the record flatly contradicts Defendant's claim of abuse of the grand jury process, and that he cannot show any

coercion amounting to a Fifth Amendment violation based on the absence of self-incrimination warnings read at the outset of his grand jury testimony.  [Doc. 219 at 6].

When a defendant claims abuse of the grand jury process, he "has the burden of showing that the Government's use of the grand jury was improperly motivated." United States v. U.S. Infrastructure, Inc., 576 F.3d 1195, 1214 (11th Cir. 2009). Absent a strong showing to the contrary, "'the law presumes … that a grand jury acts within the legitimate scope of its authority.'"  Id. (quoting United States v. R. Enters., Inc., 498 U.S. 292, 300 (1991)).

Defendant's arguments are not supported by the record.  The January 2014 email did not state, infer, or promise that the testimony the AUSA was seeking from the corporate representative of the Companies would be limited to authenticating records or that the corporate representative was being subpoenaed to testify solely as the business records custodian.  Nor was there any need to do so. Defendant had already executed and submitted a business record certification certifying to the authenticity of the business records produced by the Companies pursuant to the September 2013 grand jury subpoena for records.  [Doc. 195 at 14].

To the contrary, the email expressly stated that the corporate representative selected by the Companies to testify on their behalf "must be prepared to answer the grand jury's questions."  [Doc. 195 at 31].  The AUSA then clarified on the record

at the very outset of Defendant's grand jury testimony that the capacity in which Defendant was appearing and offering testimony was as a representative of the Companies, not in his personal capacity.  [Doc. 195 at 39].  There was no mention of Defendant appearing solely in the role of business records custodian.

As a factual matter, nothing in the January 2014 email or the February 2014 subpoenas restricted the AUSA to questions about the business records the Companies had already produced.  But even if there had been, the law allows prosecutors to use a subpoena to obtain testimony that does not go directly to the purpose outlined in the subpoena.  See United States v. Alred, 144 F.3d 1405, 1413 (11th Cir. 1998) ("When it is shown that a subpoena might assist the grand jury in its investigation, the subpoena should issue, even though the prosecutor possibly will use the information procured for a purpose other than obtaining evidence for the particular grand jury investigation.").  The law is clear that grand juries have "broad investigative authority" to investigate crimes and are subject to fewer evidentiary and procedural restrictions than other criminal proceedings.  Id.; see also United States v. R. Enters., Inc., 498 U.S. 292, 298 (1991) ("A grand jury 'may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials.'").

Defendant argues that the "administrative error" claim by the AUSA and the reissuance of subpoenas to Defendant as a corporate representative were part of an elaborate ruse to elicit incriminating testimony from Defendant. [Doc. 225 at 11]. The evidence, however, does not support Defendant's argument.

First, the AUSA's January 2014 email was sent to Defendant's counsel, not directly to Defendant. Although Defendant now suggests that the AUSA intentionally misstated the law about a corporate representative's ability to invoke the privilege, there was nothing preventing defense counsel from making his own independent analysis of the situation. Defense counsel could have evaluated the availability or nonavailability of the Fifth Amendment privilege and the proper scope of the anticipated testimony, and advised Defendant as to what he should anticipate and what his rights were with regard to asserting his Fifth Amendment privilege against self-incrimination.[3]

Nor is there anything in the record from which the Court could infer that Defendant's ability to consult with his own counsel prior to giving his grand jury testimony was in any way restricted. See United States v. Mandujano, 425 U.S. 564, 596 (1976) (Brennan, J., concurring) (noting that a defendant's privilege is placed in lesser jeopardy after having "consulted with counsel and thereby hav[ing] been

---

[3] I note that there is no evidence showing that Mr. Murrin was actually duped or confused by the email.

made aware of his privilege"); United States v. Serrano, 406 F.3d 1208, 1216 (10th Cir. 2005) (denying claim of witness intimidation when potential witness consulted with counsel); United States v. Santiago-Becerril, 130 F.3d 11, 25 (1st Cir. 1997) (rejecting claim of coercion of witness where court "provided the witness with counsel with whom she conferred privately before making her decision whether to testify"). Defense counsel had more than a month between the time he received the AUSA's email communication (January 25, 2014) and when Defendant testified before the grand jury (February 26, 2014) to advise Defendant about his Fifth Amendment rights and any other topic he felt was necessary, prudent, or warranted.

Second, the actual wording of the AUSA's January 2014 email undermines, rather than supports, Defendant's contention that the AUSA sought to change the addressees of the subpoenas in order to trick or lure Defendant into testifying without invoking his Fifth Amendment rights. The email expressly instructed that "[t]he LLC can designate whomever it wishes to appear on its behalf before the grand jury." [Doc. 195 at 31]. Thus, the AUSA left it up to the Companies to designate the individual or individuals who would provide testimony on their behalf. The purported "ruse" would have been easily thwarted by designating a different witness to speak on the companies' behalf.

Defendant repeatedly argues that the "bait-and-switch" nature of the AUSA's conduct with regard to the February 2014 subpoenas is obvious from the questions

asked by the AUSA during Defendant's grand jury testimony.  [Doc. 225 at 4].

Defendant finds it remarkable that the AUSA never asked Defendant to identify any

of the subpoenaed corporate records he had produced, never asked him to

authenticate the corporate records or certify that they were kept in the ordinary

course of business, and never asked him to describe the process that he undertook to

identify and gather responsive records.  [Id.].  I am less impressed.

The transcript of Defendant's grand jury testimony reflects that the AUSA

asked questions about Defendant's role in forming the Companies; about

Defendant's and the Companies' relationship to each other and to Hi-Tech; and

about certain payments by Hi-Tech to Defendant and the Companies as reflected in

the 1099s that those businesses had produced pursuant to the September 2013

subpoena.  [Doc. 195 at 39-53].  Defendant was shown and asked to identify the

September 2013 subpoena for documents the grand jury had issued to the

Companies, and the response thereto.  [Doc. 195 at 48-49].  The AUSA also asked

questions about the categories of documents sought pursuant to the September 2013

subpoena, what documents were (and were not) produced, as well as the efforts

Defendant made (or did not make) to gather the documents requested.  [Id. at 49-

51].  Defendant testified that he had not produced many documents within his

custody and control that were responsive to the September 2013 subpoena.  [Id.].

The fact that the questioning moved on to other related topics (including the nature

and types of business Defendant conducted with Hi-Tech through the Companies) does not, by itself, indicate that there was prosecutorial misconduct or constitutional error during the grand jury proceedings.

For the reasons stated, Defendant has failed to demonstrate that the AUSA committed prosecutorial misconduct and abused the grand jury process by luring Defendant to testify under false pretenses, by affirmatively misleading Defendant and his attorney with respect to Defendant's right to protect himself against self-incrimination, and by eliciting potentially prejudicial testimony that went beyond the scope of the subpoenas.

**B.** **Whether the AUSA Committed Prosecutorial Misconduct by Failing to Advise Defendant of his Fifth Amendment Rights**

Defendant also argues that the AUSA's failure to administer Fifth Amendment warnings against self-incrimination to Defendant either prior to or during Defendant's testimony is an independent violation of due process that, standing alone, warrants the exercise of this Court's supervisory powers to dismiss the indictment. [Doc. 186 at 12-13]. Defendant argues that absent such warning, the Government has failed in its "responsibility to safeguard a constitutional guarantee calculated to ensure the liberty of us all." [Id., quoting United States v. Mandujano, 425 U.S. 564, 602 (1976)].

Defendant concedes, as he must, that there is no binding precedent in this Circuit holding that full Miranda-type warnings must be given in the grand jury

context.   Defendant nevertheless asserts, however, that courts have "consistently recognized that … a witness who appears before the grand jury must be afforded warnings regarding his right against self-incrimination."   [Id. at 14].   Defendant argues that "[a]bsent adequate warnings, [grand jury] testimony may be deemed compelled or coerced, in derogation of the Fifth Amendment."   [Id.].   Defendant cites multiple out-of-circuit cases, but no binding legal authority, for this position. [Id. at 14-15].   At best, the cited authorities reached an inverse conclusion—*i.e.*, that when the Government gives such warnings to grand jury witnesses, the testimony cannot be said to be compelled or coerced. See, e.g., United States v. Goodwin, 57 F.3d 815, 817 (9th Cir. 1995) (concluding that although the witness was given incomplete Fifth Amendment warnings by the AUSA at the outset of his grand jury testimony, no compelled self-incrimination occurred); United States v. Bollin, 264 F.3d 391, 414 (4th Cir. 2001) (stating that full and complete Fifth Amendment warnings to grand jury witness, upon being sworn, "eliminated any possible compulsion to self-incrimination"); United States v. Long, 977 F.2d 1264, 1276 (8th Cir. 1992) (holding that  testimony was not coerced where defendant was advised of his rights "in a clear and thorough manner" shortly before giving grand jury testimony); United States v. Valentine, 820 F.2d 565, 572 (2d Cir. 1987) (no suppression of grand jury testimony warranted pursuant to the court's supervisory power where defendant was well advised of his constitutional and statutory rights).

While these cases look favorably on the provision of <u>Miranda</u>-type warnings, they do not stand for the proposition that if warnings are not given, then the witness was coerced or compelled to give self-incriminating testimony.

In response to Defendant's argument, the Government states that neither the Supreme Court nor the Eleventh Circuit requires such warnings—and that for decades, both have declined to address this specific question.  [Doc. 219 at 12, citing <u>United States v. Washington</u>, 431 U.S. 181, 186 (1977) (noting that it "has not decided that the grand jury setting presents coercive elements which compel witnesses to incriminate themselves.  Nor have we decided whether any Fifth Amendment warnings whatever are constitutionally required for grand jury witnesses"); <u>United States v. Olmeda</u>, 839 F.2d 1433, 1435 (11th Cir. 1988)].  The Government argues that while such warnings may be advisable, the failure to provide such warnings does not violate any rights or amount to misconduct on the part of the prosecutor.  The Government contends that this is especially true in light of the fact that Defendant has been represented by counsel at all relevant times.  [See Doc. 219 at 13-14 (citing cases)].

Although Defendant concedes that warnings are not constitutionally required, or at least that it is still an open question, he nevertheless asks this Court to exercise its supervisory jurisdiction to find that the AUSA should have utilized the "better practice" of informing Defendant of his constitutional rights either prior to or during

his testimony before the grand jury, especially where the witness is a target or putative defendant.[4]   [Doc. 225 at 6; Doc. 186 at 17-18, citing Mandujano, 425 U.S. at 604, and United States v. Pacheco-Ortiz, 889 F.2d 301, 308 (1st Cir. 1989)]. Defendant argues that "[t]here is little doubt," based on the AUSA's questioning, that Defendant was "at least a target if not a putative defendant at the time of his testimony, rendering the Government's failure to give warnings all the more egregious." [Doc. 186 at 18, citing Pacheco, 889 F.2d at 308].  Defendant also points to the Department of Justice's internal policy requiring federal prosecutors to "advise a grand jury witness of his or her rights if such witness is a 'target' *or* 'subject of a grand jury investigation." [Id. at 17-18, citing United States Attorney's Manual § 9-11.151 (now known as the "Justice Manual")[5]].

In Pacheco, the First Circuit held that the need to give warnings "is, of course, heightened when the witness is a 'putative defendant' in the case the grand jury is considering," and noted that the defendant in that case was clearly a target because his grand jury testimony occurred only two days before his indictment.  Pacheco, 889 F.2d at 307 n.4.  In this case, however, the status of Defendant at the time of his

---

[4] According to the Department of Justice guidelines, "a 'target' is a person as to whom the prosecutor or the grand jury has substantial evidence linking him/her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant."  United States v. Pacheco-Ortiz, 889 F.2d 301, 307 n.4 (1st Cir. 1989) (quoting Section 9-11.150 of the U.S. Attorneys' Manual).

[5] [Doc. 186 at 17; Doc. 219 at 17-18].

grand jury testimony is not nearly as obvious, for Defendant was not indicted until more than three years after he testified before the grand jury. Defendant has cited to no evidence showing that he was a target or putative defendant when he testified before the grand jury.

Even assuming that he may have been a target or putative defendant at that time, the Department of Justice's manual or guidelines do not create a right that Defendant can enforce. See United States v. Bobo, No. 1:06-cr-172, 2007 WL 962980, at *2 n.3 (N.D. Ga. Feb. 23, 2007 (stating that "[T]he policy discussed in the U.S. Attorney's Manual, which is neither a law nor a regulation, does not bestow upon [the defendant] the right to be informed [that he is a target] … "or that a target of a criminal investigation has a right to be informed of his privilege against self-incrimination before testifying."). The Justice Manual itself states the same thing: "[i]t is not intended to, does not, and may not be relied upon to create any rights … enforceable at law by any party in any matter civil or criminal." United States v. Lorenzo, 995 F.2d 1448, 1453 (9th Cir. 1993) (quoting manual). The cases cited by Defendant reach the same conclusion. See, e.g., Goodwin, 57 F.3d at 818 (concluding that "the failure of the AUSA to comply with [the United States Department of Justice's] internal department policy does not, without more, establish a deprivation of [the defendant's] constitutional rights"); Valentine, 820 F.2d at 572 (rejecting defendant's argument that grand jury testimony should have

been suppressed because the government did not comply with the Justice Department's guidelines).

For the reasons stated, Defendant has not shown prosecutorial misconduct based on the AUSA's failure to administer Fifth Amendment warnings to Defendant.

## C.   **Failure to Show Prejudice**

Even if Defendant had shown that the AUSA committed prosecutorial misconduct, dismissal would not be appropriate in this case because Defendant has not shown that he was prejudiced by anything the AUSA did or did not do.

Dismissal of an indictment on the ground of prosecutorial misconduct is within the district court's discretion where a sufficient showing of prejudice has been made.  United States v. Jordan, 316 F.3d 1215, 1248-49 (11th Cir. 2003) (citing United States v. Holloway, 778 F.2d 653, 655 (11th Cir. 1985)); United States v. O'Keefe, 825 F.2d 314, 318 (11th Cir. 1987) ("We conclude, therefore, that prejudice to the defendant is an essential element when a criminal defendant seeks dismissal of an indictment due to prosecutorial misconduct."); see also Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988) (holding that a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants).  The Eleventh Circuit has cautioned, however, that such a dismissal is "an extreme sanction which should be infrequently utilized."  Jordan,

18

316 F.2d at 1249 n.68 (citing United States v. Accetturo, 858 F.2d 679, 681 (11th Cir. 1988)).

To show prejudice in the context of a motion to dismiss an indictment for prosecutorial misconduct in grand jury proceedings, the defendant must show "that the violation substantially influenced the grand jury's decision to indict," or that there is "grave doubt" that the decision to indict was free from the substantial influence of such violations.  Bank of Nova Scotia, 487 U.S. at 256.

Defendant argues that he need not show prejudice, but he cites no binding caselaw to support that proposition.  [Doc. 186 at 9, 25].  In any event, there is nothing in the record to indicate that the indictment of Defendant by a different grand jury three years after he testified "was influenced in any manner by the failure to give warnings."  See Pacheco, 889 F.2d at 310.  The transcript of the grand jury testimony shows that when Defendant was questioned about emails that he may have sent attaching allegedly false certificates and audit reports, Defendant testified that he received the attachments from other Hi-Tech employees, and he disclaimed any knowledge about whether the attachments were authentic or fake.  Because the testimony was exculpatory, it is not evident how receiving Miranda-type warnings would have made a difference.

Defendant argues that there is no way of knowing whether the AUSA's alleged misconduct was confined to the first grand jury proceedings or whether, and

if so, how his purported misconduct may have "infected" the grand jury that ultimately returned the indictment against Defendant. [Doc. 186 at 20]. Defendant suggests that "[i]t is unknown whether transcripts of the testimony before the first grand jury were considered by the second, what the prosecutor said to the second grand jury concerning Mr. Schopp's testimony, what incriminating inferences the grand jury may have drawn from it, or how the grand jury may have characterized it as to truth or accuracy." [Id.]. Such speculation does not establish prejudice in this case, certainly not sufficient prejudice to require a dismissal of the indictment.

The Government states that it will not use Defendant's grand jury testimony in its case-in-chief. According to the Government, even without Defendant's testimony, the documentary evidence speaks for itself and provided sufficient evidence to support the indictment; therefore, the indictment should not be dismissed. [Doc. 219 at 22, citing Bank of Nova Scotia, 487 U.S. at 261 (stating that a court may not look behind the indictment to determine if the evidence upon which it was based is sufficient)].

Defendant has failed to meaningfully respond to the Government's prejudice arguments, except to state that while Defendant may later be vindicated at trial, that does not undo the "devastating impact" of an indictment, and that the only way this Court can ensure prosecutorial compliance with ethical standards and protect defendants from abuse of the grand jury process is to dismiss his indictment. [Doc.

186 at 14].  For the reasons discussed earlier, I see no prosecutorial misconduct.  But even if there was, Defendant has not met his burden to show "that the violation substantially influenced the grand jury's decision to indict," or that there is "grave doubt" that the decision to indict was free from the substantial influence of such violations.  <u>Bank of Nova Scotia</u>, 487 U.S. at 256.

For this reason and the other reasons discussed above, I recommend that Defendant's motion for the extraordinary remedy of dismissal of the indictment be DENIED.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, I **RECOMMEND** that Defendant's Motion to Dismiss the Indictment [Doc. 186] be **DENIED**.  Defendant's alternative request for an evidentiary hearing is **DENIED**.

**IT IS SO RECOMMENDED AND ORDERED**, this 27th day of March, 2019.


CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE